IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BROTHERHOOD MUTUAL INSURANCE COMPANY, : | CIVIL ACTION |
| Plaintiff, : | NO. 08-5267 |
| v. : | |
| LANCASTER CONFERENCE OF THE MENNONITE CHURCH, et al., : | |
| Defendants. : | |

# MEMORANDUM

**Jones, II, J.**                                                                                           **May 31, 2011**

This declaratory judgment action arises out of an insurance coverage dispute, specifically: whether Plaintiff Brotherhood Mutual Insurance Company ("Brotherhood" or "Plaintiff") is obligated to defend or indemnify Defendants Lancaster Conference of the Mennonite Church ("LMC"), Bishop Freeman Miller ("Bishop Miller") or Philadelphia Ministry Partnership ("PMP") (collectively, "Defendants") in the underlying action captioned *Kapatiran Christian Church, Inc. v. Freeman Miller, et al.*, Pennsylvania Court of Common Pleas, Delaware County, No. 07-6216 (the "Kapatiran Action").[1]

The parties have fully briefed cross-motions for summary judgment. Before the Court are (1) Plaintiff's Motion for Summary Judgment, which incorporates Brotherhood's Statement of Undisputed Facts ("Pl. SOF"), and brief in support of said Motion ("Pl. Mem.") (collectively, Dkt. No. 22); (2) Defendants' Answer to Plaintiff's statement of facts (Dkt. No. 26), as well as

---

[1]Brotherhood also filed its Complaint against Kapatiran Christian Church ("Kapatiran"). However, the Court dismissed Kapatiran on July 27, 2009 (Dkt. No. 15) for Plaintiff's failure to prosecute its claims against Kapatiran.

Defendants' brief in opposition to Plaintiff's summary judgment motion (Dkt. No. 27) ("Defs. Opp. to Pl. MSJ"); (3) Plaintiff's Reply to Defendants' Answer (Dkt. No. 28); (4) Defendants' Motion for Summary Judgment (Dkt. No. 23) ("Defs. MSJ"), which includes Defendants' Statement of Material Facts (Ex. 9 to Dkt. No. 23) and Defendants' brief in support of their summary judgment motion (Dkt. No. 24) ("Defs. Mem."); (5) Plaintiff's Answer to Defendants' summary judgment motion and statement of facts (Dkt. No. 25); and (6) Defendants' Reply in support of their summary judgment motion (Dkt. No. 29). In addition to the parties' cross-motions for summary judgment, Defendants assert a Counterclaim to recover the attorneys' fees incurred by LMC in defending against this declaratory judgment action (Dkt. No. 20 ("Counterclaim")). For the reasons set forth below, Plaintiff's summary judgment motion will be GRANTED, Defendants' summary judgment motion will be DENIED, and Defendants' Counterclaim for reimbursement of attorneys' fees will be DENIED.

I.     **FACTUAL BACKGROUND**

    A.     **The Kapatiran Action**

In May 2007, Kapatiran filed a complaint against Bishop Miller, LMC, PMP and others in the Kapatiran Action (Compl., Ex. A ("Kapatiran Compl.")). The Kapatiran Complaint alleges as follows:

- Kapatiran purchased property located at 825 Beechwood Road, Havertown, Pennsylvania, where its members worshipped ("the Property") (Kapatiran Compl.¶¶ 2, 15);
- LMC was an "umbrella organization" affiliated with Kapatiran, but had no right or power to interfere with Kapatiran's religious or business affairs (*id.* ¶ 13);
- Bishop Miller holds or held the position of Bishop of LMC (*id.* ¶ 4);
- In November 2003, a majority of Kapatiran's membership wrote a resolution to Bishop Miller requesting that ownership of the Property be turned over to the majority membership (*id.* ¶¶ 19, 23);
- Bishop Miller never responded to the resolution (*id.* ¶ 24);

2

- Bishop Miller suspended the church's services on March 6, 2005, although Kapatiran was never dissolved (*id.* ¶¶ 27-28);
- The Chairman of Kapatiran's Church Council and its Treasurer sold the Property to LMC in May 2005 for one dollar (*id.* ¶ 29);
- LMC then sold the Property to the Chinese Assembly of God for $295,000 in October 2005 (*id.* ¶ 30);
- The proceeds of the sale were given to PMP, which is controlled by Bishop Miller (*id.* ¶ 31);
- Defendants sold the Property without the right to do so, conferred a benefit on themselves by keeping the proceeds, intentionally misrepresented that the proceeds would be paid to Kapatiran and conspired to do so with an intent to defraud (*id.* ¶¶ 35-39, 47-48, 55).

The Kapatiran Complaint asserts claims against all Defendants for unjust enrichment, fraud and deceit (sale of the property), civil conspiracy, breach of fiduciary duty and punitive damages. *Id.* ¶¶ 33-59, 78-86. The plaintiff in the Kapatiran Action seeks to recover the proceeds from the sale of the Property, interest, attorney's fees and costs, and punitive damages. *Id.*

B. **The Brotherhood Policy**

LMC is the named insured on policy no. 37M9A0344368 issued by Brotherhood ("the Policy"). (Compl. ¶ 22; Compl., Ex. B.) The Policy provides Directors and Officers Liability Coverage as well as Commercial Liability Coverage. (*Id.*) Brotherhood issued a "Reservation of Rights" letter to LMC on July 29, 2008 concerning Plaintiff's defense of Defendants in the Kapatiran Action; the purpose of the letter was "*not* to deny coverage at this time, but to inform [Defendants] of a potential lack of coverage in relation to the claims being presented." (Ex. F. to Defs. MSJ (emphasis in original).) While Brotherhood indicated that it would defend LMC, Bishop Miller and PMP at the outset of the Kapatiran Action, it "retain[ed] the right to investigate the claim, to deny the existence of insurance coverage when applicable, to withdraw from the defense of any lawsuit brought against [LMC], and to refuse to pay any judgment which

may be entered against [LMC] if it determines that the policy affords no coverage for the claims made." (*Id.*)  In other words, Brotherhood agreed to provide Defendants a courtesy defense under a reservation of rights.

### 1. *Leadership Liability Coverage*

The Directors and Officers Liability Coverage form provides Leadership Liability Coverage for "sums which a covered person becomes legally obligated to pay as damages due to financial damage to which this coverage applies." (Ex. A to Defs. MSJ, Directors and Officers Liability Coverage Form ("D&O Form") at 1.)  The Leadership Liability Coverage form defines "covered person" to mean "you and your leaders." (*Id.*)  "You" is defined in the Policy as "the person, persons or organization named as the insured on the declarations." (Ex. B. to Pl. SOF, Commercial Liability Coverage Form ("Comm. Form") at 2.)[2]  "Leader" is defined as "a person (whether or not a director or officer) while serving as a member of your governing board, or your administrator, director, officer or trustee, but only if acting on your behalf and within the scope of their delegated authority as such." (D&O Form at 1.)  PMP is not named as an insured on the declarations of the Policy. (Ex. B to Pl. SOF, Common Policy Declarations, at 1; Commercial Liability Declarations at 1.)

The Leadership Liability Coverage of the Policy provides that "the event or events causing financial damage . . . must be an occurrence . . ." (D&O Form at 1-2.)  The Policy defines "occurrence as "an accident and includes repeated exposure to similar conditions." (Comm. Form at 3.)  The Liability and Medical Coverage Form ("L&M Form") of the Policy

---

[2]The definitions in the Commercial Liability Coverage form also apply to the Leadership Liability Coverage.  (D&O Form at 3.)

defines damages to mean "compensation in the form of money for a person or entity who claims to have suffered an injury. But damages do not include any money that would have been owed (by statute, contract or otherwise) independent of such injury." (Ex. B to Pl. SOF, L&M Form, at 1.)

Exclusion 2 of the Leadership Liability Coverage states that the Policy does "not pay for loss of any kind arising directly or indirectly out of or in connection with any actual or alleged . . . fraudulent or self-serving acts, willful harm . . ." (D&O Form at 2.) Exclusion 6 states that the Policy does not apply to "loss of any kind arising directly or indirectly out of or in connection with any dispute involving the existence, validity or extent of title to any property, including disputes involving a determination of your interest in real, personal or intangible property." (*Id.*) Exclusion 3 bars coverage for "any exemplary or punitive damages." (*Id.*)

    2. *Commercial Liability Coverage*

Coverage L (Bodily Injury Liability and Property Damage Liability) of the Commercial Liability Coverage provides coverage for "sums which an insured becomes legally obligated to pay as damages due to bodily injury or property damage to which this insurance applies. The bodily injury or property damage must be caused by an occurrence . . ." (Comm. Form at 4.) The Policy defines "occurrence" as "an accident and includes repeated exposure to similar conditions." (*Id.* at 3.) The Policy defines "property damage" as:

(a) physical injury to or destruction of tangible property; or

(b) the loss of use of tangible property whether or not it is physically damaged. Loss of use is deemed to occur at the time of the occurrence that caused it.

(*Id.* at 4.) Exclusion 2 of the Additional Exclusions that Apply Only to Property Damage states

5

that the coverage does not apply to "property damage to premises you sell, give away or abandon, if the property damage arises out of any part of those premises . . . ." (*Id.* at 9.)

       3.     *Provisions Applicable to All Coverages*

The L&M Form provides that "all provisions of the Commercial Liability Coverage Form (GL-100) and any Liability Coverage Endorsements or Medical Coverage Endorsements (BGL Forms) of the Policy are subject to the terms of this form." (L&M Form at 1.) Exclusion 1 of the L&M Form states that the insurance does not apply to "loss of any kind . . . which is expected by, directed by or intended by any insured or by any covered person; or . . . that is the result of intentional or malicious acts of any insured or any covered person." (*Id.* at 5.) Paragraph 12 ("Related Organizations") of the Conditions section of the L&M Form states that the Policy provides "no coverage under this policy for any loss arising out of the operations of any related organization/operation that exists at the inception date of this policy unless such related organization/operation is properly designated in the Declarations, or is otherwise specifically insured by us under another policy . . . ." (*Id.* at 9.) Paragraph 23 ("Organizational Disputes") of the Conditions section of the L&M Form states, in pertinent part, that

> [i]f any dispute should arise within your organization concerning who controls the organization or who controls or owns your organizational property or assets, no coverage of any kind will apply under this policy to any person, group or entity in relation to such dispute . . .

(*Id.* at 10.)

       4.     *Liability Defense Coverage*

The Policy includes Liability Defense Reimbursement ("LDR") Coverage, which provides that Brotherhood "will reimburse those defense costs incurred by a covered person who

6

is named as a defendant in a covered lawsuit to which this insurance applies . . ." (Ex. B to Pl. SOF, LDR Form at 2.) The Policy defines "covered lawsuit" to include "a civil lawsuit, civil administrative proceeding or similar civil action . . . alleging . . . the failure to procure or maintain insurance . . ." (*Id.* at 1.) The LDR Coverage further provides that "the event or events upon which the covered lawsuit is based . . . must be an occurrence . . ." (*Id.* at 2.)

### III. PROCEDURAL HISTORY

On November 5, 2008, Brotherhood initiated the instant action by filing suit in this Court, asserting diversity jurisdiction and seeking an order from this Court that it has no duty to defend or indemnify Defendants for any claims asserted in the Kapatiran Action. After an extension of time was granted, Defendants filed their Answer and Affirmative Defenses on March 10, 2009 (Dkt. No. 9.) Pursuant to Court permission, Defendants then filed an Amended Answer and Counterclaim on December 4, 2009 (Dkt. No. 20.) Brotherhood answered Defendants' Counterclaim on December 18 (Dkt. No. 21), and filed its summary judgment motion on January 28, 2010. Defendants filed their cross-motion for summary judgment on February 1, 2010. Brotherhood and Defendants filed their oppositions to the cross-motions on February 24, 2010 and March 3, 2010, respectively. All parties filed replies on March 17, 2010.

### IV. JURISDICTION

Plaintiff is a corporation organized and existing under Indiana law, with its principal place of business in Fort Wayne, Indiana. LMC and PMP maintain their principal places of business in Lancaster, Pennsylvania. Bishop Miller resides in Philadephia, Pennsylvania. As such, this Court maintains jurisdiction over this action based upon diversity of the citizenship of the parties, pursuant to 28 U.S.C. § 1332. *See* Compl. ¶ 6.

## V. STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(c), summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a summary judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56(c). In order to defeat a motion for summary judgment, disputes must be both (1) material, meaning concerning facts that will affect the outcome of the issue under substantive law, and (2) genuine, meaning the evidence must be such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322-23. An issue is genuine if the fact finder could reasonably return a verdict in favor of the non-moving party with respect to that issue. *Anderson*, 477 U.S. at 248. In reviewing a motion for summary judgment, the court "does not make credibility determinations and must view facts and inferences in the light most favorable to the party opposing the motion." *Seigel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1127 (3d Cir. 1995).

## VI. DISCUSSION

The parties agree that the relevant facts are undisputed. The issue before the Court is the interpretation of the Policy, which is a question of law. *Canal Ins. Co. v. Underwriters at Lloyd's London*, 435 F.3d 431, 434 (3d Cir. 2006); *Donegal Mut. Ins. v. Baumhammers*, 938 A.2d 286, 290 (2007).

8

### A. Duty to Defend and Indemnify

#### 1. Legal Standard

Where a party seeks a declaration regarding the rights and obligations of parties under an insurance contract, this Court applies the appropriate state law, which the parties agree here is Pennsylvania law. *State Farm Fire & Casualty Co. V. Corry*, 324 F. Supp. 2d 666, 671 n.4 (E.D. Pa. 2004). Under Pennsylvania law, "[i]t is well established that the duty to defend and pay the costs of defense is broader than the duty to indemnify." *J.H. France Refractories v. Allstate Ins. Co.*, 626 A.2d 502, 510 (Pa. 1993) (citing *Erie Ins. Exchange v. Transamerica Ins. Co.*, 533 A.2d 1363, 1368 (1987)).

To determine whether an insurance carrier has a duty to defend, a court must review the insurance policy language and the language of the factual allegations in the underlying complaint. *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Comm. Union Ins. Co.*, 908 A.2d 888, 896 (Pa. 2006); *Mut. Benefit Ins. Co. v. Haver*, 725 A.2d 743, 745 (Pa. 1999). It is improper for a court to look beyond the underlying complaint and the insurance policy to determine whether an insurer had a duty to defend. *Kvaerner Metals*, 908 A.2d at 896. The duty to defend arises whenever an underlying complaint may "potentially" come within the insurance coverage. *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 746 (3d Cir. 1999); *Erie Ins. Exchange v. Claypoole*, 673 A.2d 348, 355 (Pa. 1996) ("[O]nly allegations contained within the underlying complaint pertaining to injuries which are either actually or potentially within the scope of the insurance policy obligate the insurer to defend the insured.") (citations omitted). If the complaint alleges facts that might fall within the policy's coverage, "then coverage is triggered and the insurer has a duty to defend until such time that the claim is confined to a recovery that the policy

does not cover." *Gen. Acc. Ins. Co. v. Allen*, 692 A.2d 1089, 1095 (Pa. 1997).

Furthermore, a duty to indemnify only arises where a duty to defend is owed. *Kvaerner Metals*, 908 A.2d at 896 n.7 (citing *Scopel*, 698 A.2d at 605). Both duties "flow from a determination that the complaint triggers coverage." *Kvaerner Metals*, 908 A.2d at 896 n.7 (citing *Allen*, 692 A.2d at 1095).

2. *Policy Coverage of an "Occurrence"*

The Leadership Liability Coverage applies to "financial damage" arising out of wrongful acts by the insured's "leader" as part of his or her "leadership activity." (D&O Form at 1.) The Policy provides that the event causing the financial damage must "be undertaken in furtherance of your religious or not-for-profit purposes and must be an occurrence." (*Id.* at 2.) The Policy then defines "occurrence" as "an accident and includes repeated exposure to similar conditions." (Comm. Form at 3.)

Relying on dictionary definitions of the word, the Pennsylvania Supreme Court has construed "accident" to include "[a]n unexpected or undesirable event," or "something that occurs unexpectedly or unintentionally." *Kvaerner Metals*, 908 A.2d at 898.[3] Most important is

---

[3] Defendants object that *Kvaerner Metals* is "of little value in considering the specific policy language" set forth in the instant matter, because *Kvaerner Metals* "involved a completely different factual scenario, a completely different policy and a completely different legal question then [sic] what is presented in the matter at hand." (Defs. Opp. to Pl. MSJ at 10 n.3.) However, the policy in *Kvaerner Metals* parallels the Policy here quite clearly; the factual and legal question differences present red herrings. The *Kvaerner Metals* policy applied to "bodily injury" or "property damage" caused by an "occurrence," and, as here, an "occurrence" was defined by the policy itself as "an accident, including continuous or repeated exposure to substantially the same or general harmful conditions." *Kvaerner Metals*, 908 A.2d at 897. An "accident," in turn, was defined by dictionary terms. *Id.*

Regardless of the factual or legal scenario, *Kvaerner Metals* emphasizes the importance of construing "words of common usage in an insurance policy . . . according to their natural, plain, and ordinary sense." *Id.* (citing *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735

the "unexpected" element. *Id.*; *Baumhammers*, 938 A.2d at 292 ("an injury therefore is not 'accidental' if the injury was the natural and expected result of the insured's actions"); *see also Minn. Fire & Cas. Co. v. Greenfield*, 855 A.2d 854, 870 (Pa. 2004) (an "'accident' has been defined in the context of insurance contracts as 'an event or happening without human agency or, if happening through such agency, an event which, under circumstances, is unusual and not expected by the person to whom it happens'" (quoting BLACK'S LAW DICTIONARY (6th ed. 1990))). As such, an "occurrence" requires an accidental event. *Minn. Fire & Cas. Co.*, 855 A.2d at 861 n.6 (citing *Gene's Rest., Inc. v. Nationwide Ins. Co.*, 548 A.2d 246, 247 n.1 (Pa. 1988)).

The Kapatiran Action alleges intentional conduct by Bishop Miller and LMC in purchasing the property from the Chairman of Kapatiran's Church Council and its Treasurer, in selling it to another church, and in giving the sales proceeds to PMP. (Kapatiran Compl. ¶¶ 42, 47, 55.) The Action further alleges that the Kapatiran defendants intentionally misrepresented that the proceeds would be paid to Kapatiran, conspired to commit the alleged wrongful acts and

---

A.2d 100, 108 (Pa. 1999)). Where a term such as "accident" is not defined by an insurance policy, the Court "may consult the dictionary definition of a word to determine its ordinary usage." *Kvaerner Metals*, 908 A.2d at 897; *see Snyder Heating v. Pa. Mfrs.' Ass'n Ins. Co.*, 715 A.2d 483, 487 (Pa. Super. 1998) (where policy language was same as in *Kvaerner Metals*, contractual claims of poor workmanship did not constitute "active malfunctioning" needed to establish coverage under policy); *Kline v. Kemper Group*, 826 F. Supp. 123, 128-29 (M.D. Pa. 1993) (allegations that employer terminated employee on basis of his age was not allegation of accidental or unintended consequence of employer's conduct, but of intentional act, and thus, claim asserted by employee in age discrimination action could not be considered "occurrence" as defined by employer's primary or excess comprehensive liability and commercial catastrophe policies); *Scopel v. Donegal Mut. Ins. Co.*, 698 A.2d 602, 605-606 (Pa. Super. 1997) (underlying complaint alleging assault by insured did not portend accidental injury giving rise to homeowners' insurer's duty to defend, even though as general matter assault may be proven by showing that accused party acted recklessly, where complaint contained no such allegations and instead alleged intentional, willful, and malicious conduct and requested punitive damages).

did so with an intent to defraud Kapatiran. These acts were not accidents, and thus they cannot be considered "occurrences" for purposes of the Leadership Liability Coverage.

While contending that Brotherhood advances a "hyper-technical argument involving the definition of an 'occurence,'" Defendants point out that the Kapatiran Complaint alleges both intentional and negligent actions by Defendants. (Defs. Opp. to Pl. MSJ at 4-6 (citing Kapatiran Compl. ¶¶ 20, 31, 56 (allegations that Defendants mismanaged church monies, failed to follow church by-laws in decision-making, and improperly amended by-laws); ¶¶ 52-54, 56-57 (allegations that Defendants violated their fiduciary duties *either* intentionally *or* recklessly); and ¶¶ 33-40 (allegations that Defendants breached a duty to distribute Church property sales proceeds to a Filipino organization as mandated by by-laws and that such actions and decisions were inequitable and unjust).)) As explained above, if a complaint alleges facts that *could* be covered by the policy at issue, the insurer must defend the entire matter until the claims are narrowed to those clearly outside the scope of coverage. *United Services Auto. Assoc. v. Elitzky*, 517 A.2d 982, 985 (Pa. Super. 1986). Accordingly, Defendants argue that Brotherhood must defend them because certain of the allegations in the Kapatiran Complaint could be the result of negligence and carelessness–in other words, should be considered accidental and thus "occurrences" covered by the Policy. (Defs. Opp. to Pl. MSJ at 5 (citing *Westport Ins. Corp. v. Black, Davis & Shue Agency, Inc.*, 513 F. Supp. 2d 157, 167-68 (W.D. Pa. 2007) (finding a duty to defend where allegations of mismanagement of funds could have resulted from a fraudulent scheme *or* from poor business management)).)[4]

---

[4]Defendants devote further attention to their argument that these allegations "certainly constitute 'wrongful acts' that were made as part of the decision-making acts of the leaders, which is what is covered by the additional leadership liability coverage." (Defs. Opp. to Pl. MSJ

Closer examination of the Kapatiran Complaint, however, shows that it does not in fact allege that Defendants mismanaged church monies and failed to follow church by-laws in decision-making, such as to constitute negligent action and thus an "occurrence" covered by the Policy. The Complaint alleges the Kapatiran Church sought the resignation of several individuals from their positions in the church's organization because of *those* individuals' mismanagement of church monies and violation of church by-laws. (Kapatiran Compl. ¶¶ 19-21 (averring that William and Aquilina Leduna mismanaged church monies and violated church by-laws, and that the Ledunas and Miriam Punzalan refused to honor requests to produce financial reports or submit to audit).) The Ledunas and Ms. Punzalan are defendants in the Kapatiran Action, but they are not parties to this action, nor are they insured under the Policy. The Court here is concerned with whether the conduct of the Defendants in the current action constitutes an "occurrence;" the conduct of their co-defendants in the Kapatiran Action is irrelevant.

Similarly, Defendants' improper amendment of church by-laws and breach of fiduciary duty are alleged as "an attempt to further [Defendants'] own individual interests, which were at odds with [Kapatiran] and the majority of its members." (Kapatiran Compl. ¶ 55.) This context makes clear that the Kapatiran Complaint alleges *intentional* behavior on Defendants' part: acting with the intent to further their own interests and deprive the Church of the proceeds of the sale of its property. Along the same lines, the claim for unjust enrichment in the Kapatiran Action is based on allegations that Defendants sold the Church's property with Kapatiran's consent or the right to do so, and that Defendants benefitted by keeping the sales proceeds, which

---

at 5 and 8.) However, Brotherhood does not contest that "wrongful acts" occurred, but argues that those wrongful acts did not constitute "occurrences."

should have gone to Kapatiran. (Kapatiran Compl. ¶¶ 34-40.) These, too, are deliberate acts.

While any ambiguities in a policy must be construed in favor of the insured and against the insurer, the Court does not find any ambiguity in the terms of the Policy here. The conduct alleged in the Kapatiran Complaint cannot be considered accidental, and thus no "occurrence" has taken place. *See St. Paul Fire & Marine Ins. Co. v. Lewis*, 935 F.2d 1428, 1431 (3d Cir. 1991) (insurance policy language may not be tortured to create ambiguities where none exist). While perhaps not the intent nor the expectation of Defendants in purchasing the Policy, the Leadership Liability Coverage does not apply to the conduct alleged in this matter.[5] Indeed, if it did, Defendants would be allowed, *de facto*, to keep the Church property sales proceeds for themselves in violation of Church by-laws–an untenable outcome. Brotherhood has no duty to defend the Kapatiran Action, and therefore no duty to indemnify LMC therein. *Kvaerner Metals*, 908 A.2d at 896 n.7 (citing *Scopel*, 698 A.2d at 605 (where there is no duty to defend, there is no duty to indemnify)).[6]

---

[5] Defendants' reliance on *Britamco Underwriters v. Emerald Extract Co.*, 855 F. Supp. 793 (E.D. Pa. 1994) is misplaced. (Defs. Mem. at 11-12 (citing *Britamco* for proposition that allegations of breach of fiduciary duty sufficiently state a claim within scope of Policy coverage).) *Britamco* did not concern an "occurrence"-based policy. More importantly, the *Britamco* court explicitly held that because the *conduct* alleged in the initial complaint could have been either negligent or intentional, it was irrelevant whether the insured asserted a *claim* based on negligence; the facts alleged on the face of the complaint did not preclude the possibility that the claim was based on negligent conduct and thus covered by the policy at issue. Here Defendants present the reverse scenario: they assert a negligence-based claim, but the facts set forth in the Kapatiran Complaint do not in fact present any factual allegations sounding in negligence. Simply claiming negligence without any factual allegations in support of that claim does not bring the claim within the purview of the Policy.

[6] As the Court finds that the Policy's Leadership Liability Coverage does not apply to the Kapatiran Action because the Kapatiran Complaint does not allege an "occurrence," it need not reach Brotherhood's additional arguments as to why the Policy does not provide coverage for said Action. In those arguments, Brotherhood claims that (1) the Leadership Liability

14

**B.     Counterclaim for Liability Defense Reimbursement Coverage**

Defendants have asserted a counterclaim for reimbursement of the legal costs incurred by LMC in this declaratory judgment action, pursuant to the Policy's Liability Defense Reimbursement Coverage endorsement. However, the Policy simply does not provide for reimbursement of defense costs here. The Liability Defense Reimbursement Coverage endorsement states that Brotherhood "will reimburse those defense costs incurred by a covered person who is named as a defendant in a covered lawsuit to which this insurance applies . . ." In turn, a "covered lawsuit" is defined by the Policy to include "a civil lawsuit, civil administrative proceeding or similar civil action . . . alleging . . . the failure to procure or maintain insurance . . ." While Defendants contend that the instant action is a "covered lawsuit" because it is a "dispute over insurance coverage" (Counterclaim ¶ 63), there are no allegations of any failure on Defendants' part to procure or maintain insurance.[7] This matter concerns only the scope of the maintained Policy's coverage. Accordingly, this declaratory judgment action is not a "covered lawsuit" and Defendants are not entitled to reimbursement of LMC's expenses in

---

Coverage's "fraudulent acts," "title dispute" and "punitive damages" exclusions bar coverage thereunder; (2) the Kapatiran Complaint does not assert a claim for "damages," "bodily injury" or "property damage" under the Leadership Liability Coverage or the Commercial Liability Coverage;"(3) the Liability and Medical Coverage Form's "expected or intended" and "organizational disputes" exclusions bar any Policy coverage; and (4) PMP is not an insured named on the Policy.

[7]Defendants argue that Brotherhood alleges that LMC failed to procure or maintain insurance that would provide coverage in the underlying Kapatiran Action. (Defs. Mem. at 14 (citing Complaint ¶¶ 23-39).) They also argue that this declaratory judgment action is a "covered lawsuit" because it involves a determination regarding a contractual dispute. (*Id.* (claiming that Brotherhood alleges LMC breached the terms and provisions of the Policy by calling for Brotherhood to defend the Kapatiran Action).) Defendants provide no legal or factual support for this recasting of the dispute, and the Court declines to adopt it.

defending it.[8]

## VII.   CONCLUSION

For the foregoing reasons, the Court finds that Brotherhood Mutual has no duty to defend or indemnify Lancaster Mennonite Conference, Bishop Freeman Miller or Philadelphia Ministry Partnership in the Kapatiran Action. Accordingly, the Court will grant summary judgment to Plaintiff, deny summary judgment to Defendants, and deny Defendants' Counterclaim for reimbursement of attorneys' fees

An appropriate Order follows.

---

[8] In addition, the Liability Defense Reimbursement Coverage requires that "the event or events upon which the covered lawsuit is based . . . must be an occurrence. . ." As discussed above, *supra* Section VI.A.2, the events underlying the Kapatiran Action and this declaratory judgment action do not constitute an "occurrence." Thus, even if the instant matter were a "covered lawsuit," the Policy would still not provide for reimbursement of defense costs here.

16

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BROTHERHOOD MUTUAL INSURANCE COMPANY, | : : : | CIVIL ACTION |
| Plaintiff, | : : | NO. 08-5267 |
| v. | : : | |
| LANCASTER CONFERENCE OF THE MENNONITE CHURCH, et al., | : : : | |
| Defendants. | : | |

## ORDER

AND NOW, this 31st day of May, 2011, upon consideration of the parties' cross-Motions for Summary Judgment and supporting memoranda, and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED that:

1. Plaintiff Brotherhood Mutual Insurance Company's Motion for Summary Judgment (Dkt. No. 22) is GRANTED;

2. Defendants Lancaster Mennonite Conference, Bishop Freeman Miller and Philadelphia Ministry Partnership's Motion for Summary Judgment (Dkt. No. 23) is DENIED;

3. Plaintiff has no duty to defend or indemnify Defendants in the action *Kapatiran Church, Inc. v. Freeman Miller, et al.*, Court of Common Pleas, Delaware County, No. 07-6216; and

4. Defendants' Counterclaim for reimbursement of attorneys' fees is DENIED.

BY THE COURT:

/s/ C. Darnell Jones, II

———————————————
C. DARNELL JONES, II    J.